2021 IL App (1st) 191352-U

FIFTH DIVISION
Order filed: March 26, 2021

No. 1-19-1352

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 8594 (02) |
| | ) | |
| SHAQUILLE WRIGHT, | ) | Honorable |
| | ) | Brian K. Flaherty, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Delort and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*: We reverse the circuit court's first-stage dismissal of the defendant's postconviction petition and remand the matter for second-stage proceedings because he stated an arguable claim of actual innocence.

¶ 2    The defendant, Shaquille Wright, appeals from an order of the circuit court of Cook County, dismissing his *pro se* postconviction petition filed under the Post-Conviction Hearing Act (Act) (725 ILCS 122-1 *et seq.* (West 2018)) at the first stage of proceedings. On appeal, he

contends that the circuit court erred in summarily dismissing his petition because he stated three arguable claims: (1) actual innocence; (2) the State violated *Brady v. Maryland*, 373 U.S. 83 (1963); and (3) his sentence violated both the Illinois and United States Constitutions. For the reasons that follow, we reverse and remand for second-stage proceedings under the Act.

¶ 3    In April 2012, the defendant, who was 17 years old at the time, and the codefendant, Brian Lewis, were charged by indictment with, *inter alia*, attempted first-degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2012)), aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2012)), aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(l) (West 2012)), and aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(1), (3)(A) (West 2012), based upon a shooting incident that occurred on April 3, 2012.

¶ 4    At trial, Marlo Davis testified that, on April 3, 2012, he was playing basketball at Riverdale Park with Rondale Standors, Andre Kidd, Ebony Cain, and several others.[1] At one point, three men exited a black sedan, entered the basketball court, spoke briefly with Cain, and left. Davis identified two of the men who approached Cain as the defendant and the codefendant. Approximately 30 minutes later, three armed men in black hoodies and masks approached the basketball court and opened fire, causing everyone to flee. As Davis climbed the fence surrounding the basketball court, he heard bullets striking the fence. Eventually, he ran through some backyards and entered a side street where he observed one of the offenders approaching from 20 or 25 feet, no longer wearing a mask. He identified the offender as the codefendant, explaining that he was wearing the same black hoodie that he wore during the shooting. Davis notified a Metra police officer, and the officer followed the codefendant.

_____

[1] During his testimony, Davis acknowledged having three felony convictions.

¶ 5    Standors testified and mostly corroborated Davis's account of the events that occurred before and during the shooting.[2] Standors differed from Davis regarding how many people originally approached the basketball court, six versus three, and who they spoke to, "DeAndre" versus Cain.

¶ 6    Riverdale Police Detective Gilbert Plumey testified that he was dispatched to the basketball courts at Riverdale Park in response to a report of shots fired. Upon arrival, he observed "complete chaos" and a man, later identified as Cain, lying on the ground with gunshot wounds to the buttocks, torso, and arm. Cain was conscious but did not provide information helpful to the investigation at that time. Detective Plumey received a description of one of the offenders from Standors, which he broadcast over the radio.

¶ 7    Chanee Loston testified she was on her third-floor balcony talking to Lenee Johnson, who was on the adjacent second-floor balcony, when she heard gunshots followed by a commotion. Loston saw "three boys" talking under the back porch next door. One of the boys, whom she identified as the defendant, ran from under the porch into the alley near her garage before he fell, causing a gun to fall from his waistband and slide across the alley. He retrieved the gun and threw it in the dumpster before returning to the porch. She testified that he wore a black hoodie with another light color on it, gray or white, and was not wearing a mask.

¶ 8    Lenee Johnson testified that she was outside on her balcony when she heard gunshots. She then observed a man wearing a black and gray hoodie running toward her through the alley. She noted that he slipped and dropped a black gun near a big blue dumpster. He recovered the gun and

---

[2] At the time of trial, Standors had a pending felony case for possession of a firearm.

then placed it inside the dumpster, after which he took off the black and gray hoodie. The next day, she identified the defendant in a lineup at the police station as the man she saw in the alley.

¶ 9     Metra Police Officer Frank Manfredo testified that he was flagged down by two people while he was on patrol. He spoke to these individuals and continued driving north to 137th Street, where he was stopped again by a different person who provided him with a description of a suspect. Officer Manfredo observed the defendant, who fit the description, attempting to get into the passenger seat of a white Pontiac. The defendant looked in Officer Manfredo's direction, the Pontiac sped off, and the defendant ran north. Officer Manfredo followed and eventually arrested the defendant next to a bar near 137th and State.

¶ 10    Riverdale Police Officer Lugo was dispatched to the area of 5 West 137th Place. Officer Lugo saw the codefendant on the east side of the building, crouched down by a basement window, and arrested him. After having a brief discussion with two women on their balconies, Officer Lugo checked a nearby blue dumpster and located one firearm. He maintained the scene and two other officers recovered a jacket, mask, and two additional firearms that were located under the rear deck of a nearby building.

¶ 11    Sergeant Anthony Padron received a call of "shots fired," at which time he and Jeff Michalek, an evidence technician, proceeded to the basketball courts in Riverdale Park, secured the crime scene, and located evidence. Sergeant Padron recovered the following items: four 9 mm shell casings on the path near the perimeter of the basketball court; a zip up style jacket from the area of 10 West 137th Place with a box of .22 caliber bullets inside of the pocket; a .22 caliber revolver with six spent shell casings in the cylinder from a blue dumpster; two handguns from under the porch of the building next door, a Springfield 9 mm that was not loaded and a black 9

mm Beretta which had a bullet in the chamber and some bullets in the extended magazine; and a mask near the two semiautomatic handguns. Sergeant Padron returned to the basketball courts and searched the grassy area and court with a metal detector. He recovered four more casings. He brought the three firearms, magazines and the shell casings to the Illinois State Police Crime Lab for fingerprints, comparisons, and test firing.

¶ 12    Forensic scientist Jeffrey Parise testified as an expert in the field of firearms and firearms identification. He examined and test-fired the three firearms that were recovered. He also examined the casings and concluded that all four casings were fired from the 9 mm Beretta pistol.

¶ 13    Scott Rochowicz, a forensic scientist employed at the Illinois State Police Forensic Science Center, conducted a GSR analysis from the swabs of the defendant's hands, which was positive. Rochowicz explained that a positive GSR tests means the defendant discharged a firearm, contacted GSR from another item, or was within the environment of a discharged firearm. The codefendant's sample also tested positive for GSR. Rochowicz testified that generally vapors travel within a four-foot radius around the discharged firearm.

¶ 14    Lauren Wicevic, an expert in latent print examination at the Illinois State Police, testified that she received three firearms, two magazines and one cartridge to examine. After testing these items, Ms. Wicevic concluded that there were no fingerprints suitable for comparison on any of these items. Following Wicevic's testimony, the State rested. The defendant did not present any evidence and he did not testify on his own behalf.

¶ 15    Following arguments, the defendant was found guilty of the attempted murders of Cain and Davis and the jury found that he personally discharged a firearm during the commission of the offenses. The defendant was also found guilty of aggravated battery with a firearm of Cain, and

two counts of aggravated discharge with a firearm. The defendant filed a motion for new trial, which was denied.

¶ 16     Immediately after the defendant's motion for new trial was denied, he informed the court that he intended to file a *pro se* motion alleging, *inter alia*, that his privately retained counsel was ineffective for failing to call Cain as a witness. When the court asked the defendant to explain the basis for his motion, he stated that his trial counsel "didn't want to bring my witness which was on my side which was the victim on the case. She didn't want to use it for trial." When the court asked the defendant what Cain would have testified to, he responded that his counsel told him Cain would testify that he "didn't do it." The trial court held an inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), where the following colloquy occurred between the judge and trial counsel:

"THE COURT: Is that true that the victim [Cain] said that [the defendant] was not the person [who shot him]?

COUNSEL: No.

THE COURT: Okay. Anything else?

COUNSEL: The victim said that he didn't want to participate in the trial and that he would inform the State of that. That was our conversation."

Following the *Krankel* hearing, the trial court denied the defendant's motion.

¶ 17     On May 26, 2015, the matter proceeded to sentencing, with the defendant represented by new counsel. At the sentencing hearing, the defendant presented testimony from Cain, his grandmother, and his uncle. Relevant here, Cain testified that "[the] defendant and his cousin was on the court when the shooting happened, and they didn't shoot me. They say it was other people that shot me." On cross-examination, Cain claimed that he told this information to "the attorneys

that was up in here" on the first day he came to court in 2013. When asked what he told "the attorneys," Cain stated: "The attorneys up in here wanted me to say that it was them. They wanted me to say it was them that shot me, but I know it wasn't them that shot me because they was on the court when it happened." When asked to clarify if he was referring to the State's attorneys or the defendant's attorneys, Cain clarified that he was referring to the defendant's attorneys. Cain also admitted that he came to two or three court dates, but he was not present at trial.

¶ 18     In aggravation, the State argued that the defendant had a prior felony conviction from 2011 for unlawful use of a weapon. The State emphasized the facts of the case, noting that the defendant opened fire at a basketball court with a large group of people present, including children. Regarding Cain's testimony, the State argued that he was not credible and reminded the court of the evidence of the defendant's guilt presented at trial.

¶ 19     The defendant spoke in allocution. He explained that he was 17 years old at the time of his arrest, and he "got caught up in the case" because he was "hanging around the wrong environment and individuals." He discussed his family life and educational background, and he insisted that he had matured in jail. He promised that, when he was released, he would not get into any more trouble with the law.

¶ 20     In announcing the defendant's sentence, the court noted it reviewed the pre-sentence investigation report and factors in mitigation. Regarding Cain's testimony, the court commented that it made "no sense" because he appeared to claim that the defendant's attorneys wanted him to implicate the defendant. The court then sentenced the defendant to concurrent sentences of 32 years' imprisonment for the attempted murder of Cain (12 years for the attempted murder plus a 20-year firearm enhancement), 27 years' imprisonment for the attempted murder of Davis (7 years

for the attempted murder plus a 20-year firearm enhancement), 10 years' imprisonment for aggravated discharge of a firearm, and 3 years' imprisonment for aggravated unlawful use of a weapon.

¶ 21    On direct appeal, the defendant argued, *inter alia*, that his trial counsel was ineffective for failing to call Cain as a witness. *People v. Wright*, 2018 IL (1st) 152015-U, ¶ 2. We affirmed the defendant's convictions and sentence, finding that, based on the facts known to trial counsel following her investigation, Cain's trial testimony would not have been exculpatory. *Id.* ¶¶ 70, 72. We therefore determined that trial counsel's decision not to call Cain as a witness at trial, "viewed in light of then-existing circumstances," was a matter of trial strategy and did not constitute deficient performance. *Id.* ¶ 70.

¶ 22    On April 22, 2019, the defendant filed a *pro se* postconviction petition under the Act, raising six claims. Relevant to this appeal, the defendant alleged the following: (1) he was denied due process because the State "tamper[ed] with" Cain prior to trial; and (2) his sentences for attempted murder violate the proportionate penalties clause of the Illinois Constitution as applied to him, a minor at the time of his offenses.

¶ 23    Regarding his first claim, the defendant argued that Cain was willing to testify to his "actual innocence," but the trial court denied "his compusory [*sic*] process." The defendant also alleged that Cain spoke with an ASA and told him the defendant was not the perpetrator, but the ASA tried to convince him to testify otherwise. According to the defendant, the ASA then failed to relate the substance of this conversation "to the judge or on the record." He also alleged that, following Cain's conversation with the ASA, Cain was removed from the State's witness list and that his trial counsel failed to call Cain because his mother ceased making payments. The defendant argued

that this amounted to a violation of his "right guaranteed by the federal constitution to compel the attendance of witnesses at trial to elicit testimony on behalf of the defense." He insisted that the outcome of his trial would have been different if Cain had testified.

¶ 24 As to his claim that his sentences for attempted murder are unconstitutional as applied to him, the defendant's petition stated that the application of the "adult sentencing scheme," including the mandatory 20-year firearm enhancement, violated the Illinois Constitution's proportionate penalties clause as applied to him, a 17-year-old at the time of the offense. Specifically, he argued that the sentencing court was unable to properly consider his youth and other mitigating factors when fashioning a sentence. He noted that his 32-year sentence for the attempted murder of Cain meant that he would be released from prison shortly before he turns 50, which he argued "shocked the moral sense of the community." In raising this argument, the defendant also referenced *Miller v. Alabama*, 567 U.S. 460 (2012), *Graham v. Florida*, 560 U.S. 48 (2012), and *Roper v. U.S.*, 543 U.S. 551 (2005), for the proposition that children are constitutionally different than adults with regard to sentencing because of their greater potential for rehabilitation.

¶ 25 In support of his petition, the defendant attached affidavits from himself and his grandmother, Martha Crawford, as well as two affidavits from Cain and his mother, Katrina Crawford. He also attached transcripts from the June 9, 2014 court proceedings.

¶ 26 In his own affidavit, the defendant stated that, on the day in question, he and the codefendant approached Cain, who was standing on the side of the basketball courts at Riverdale Park. After speaking with Cain, the defendant asked someone named "Dre" if he could use his lighter. He then returned to speaking with Cain, who was now standing near the fence of the park. Cain was invited to join the basketball game, and the defendant and codefendant remained standing

near the fence. After 30 minutes, the pair decided to leave. As they left, the defendant saw three or four men approach the court with guns. The men opened fire and the defendant fled. The defendant hid behind a building where he was eventually apprehended by the police.

¶ 27     In Cain's first affidavit, he averred that the defendant was on the court playing basketball with him at the time he was shot, and he therefore could not have been the perpetrator. He also stated that, when the shooting began, he saw the defendant running toward the exit "along with everyone else." According to Cain, he attempted to relate this information to ASA Steven Kruger, the defendant's trial counsel, and the trial court. In his second affidavit, Cain stated that, when he testified at the defendant's sentencing hearing, he meant to say that it was ASA Kruger who told him to implicate the defendant, but he mistakenly said it was the defendant's attorney.

¶ 28     Katrina Crawford, the defendant's mother, stated in her first affidavit that, on June 9, 2014, she saw Cain walk out of the courtroom and speak with ASA Kruger. According to Katrina, she overheard Cain tell ASA Kruger: "[the defendant] did not shoot me why you [*sic*] not listening to me." In her second affidavit, Katrina averred that she stopped paying her son's trial attorney in March 2014 because she was "ineffective." According to Katrina, the defendant's trial counsel did not speak to Cain prior to trial and did not try to "fight" for her son's freedom. Martha Crawford, the defendant's grandmother, stated in her affidavit that she also saw Cain talking with ASA Kruger on June 9, 2014. According to Martha, she overheard Cain say: "he is trying to make me say what he want me to say, he is not listening to me."

¶ 29     The defendant also attached two pages of transcript from the June 9, 2014 court proceedings. According to the transcript, the defendant's case was set for jury trial on that date, but ASA Kruger informed the court that the "victim" was not present. The court then pointed out

that someone in the court was raising their hand. ASA Kruger asked the court to pass the case. When the case was recalled, ASA Kruger stated: "[i]t turned out the victim was present."

¶ 30    On May 28, 2019, the circuit court denied the defendant's petition, finding that the issues raised by the defendant were "frivolous and patently without merit." In its oral ruling, the court found that, with regard to Cain not testifying, it was trial strategy for defense counsel not to call him as a witness, which had already been addressed at both the trial and appellate level. Regarding the defendant's sentence, the court found that his sentence for attempted first-degree murder was not "inappropriate" because it was within the statutory guidelines. The court also found that his sentence did not violate the proportionate penalties clause of the Illinois Constitution because it was not a *de facto* life sentence. This appeal followed.

¶ 31    On appeal, the defendant argues that the circuit court erred when it summarily dismissed his postconviction petition at the first stage of proceedings because he raised three arguable claims: (1) actual innocence; (2) the State violated *Brady* by failing to disclose Cain's exculpatory statement to the defense; and (3) his sentences for first-degree murder are unconstitutional as applied to him. We need only consider the defendant's first claim of actual innocence because we find it dispositive of the appeal.

¶ 32    The Act provides a mechanism by which criminal defendants can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution, the Illinois Constitution, or both. 725 ILCS 5/122–1 (West 2018); *People v. Miller*, 393 Ill. App. 3d 629, 632-33 (2009). In noncapital cases, like the case at bar, the post-conviction process involves three stages. *People v. Tate*, 2012 IL 112214, ¶ 9. At the first stage, which applies here, a trial court independently reviews a defendant's petition. *People v. Brown*,

236 Ill. 2d 175, 184 (2010). If the court determines that the petition "is frivolous or patently without merit[,]" it must summarily dismiss the petition. *Id.*; see also 725 ILCS 5/122–2.1(a)(2) (West 2018). A petition is frivolous or patently without merit only if it "has no arguable basis either in law or in fact[,]' *i.e.*, it "is based on an indisputably meritless legal theory or a fanciful factual allegation." *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). "[A]n indisputably meritless legal theory is one which is completely contradicted by the record" and a fanciful factual allegation is one that is "fantastic or delusional." *Id.* at 16-17. The petition's allegations, which the court should accept as true and construe liberally, "need only present the gist of a constitutional claim[,]" which is a "low threshold[.]" *Brown*, 236 Ill. 2d at 184; see also *Tate*, 2012 IL 112214, ¶ 9 ("Because most petitions are drafted at this stage by defendants with little legal knowledge or training, this court views the threshold for survival as low."). We review a trial court's summary dismissal of a post-conviction petition *de novo. Brown*, 236 Ill. 2d at 184.

¶ 33    The defendant contends that his petition raised an arguable claim of actual innocence based on Cain's affidavit.

¶ 34    As an initial matter, the State contends that the defendant's petition did not assert a claim of actual innocence and we should therefore find that he has waived any such claim. The defendant acknowledges that none of his six claims were titled "actual innocence," but he nevertheless maintains that his petition set forth sufficient facts to state a claim of actual innocence based on Cain's affidavit. Specifically, he contends that he alleged Cain was willing to testify regarding his "actual innocence" and that "the outcome of his trial would have been different" if he had, which is sufficient to support a claim of actual innocence. We agree with the defendant.

¶ 35 The circuit court must liberally construe a petition's allegations at the first stage of proceedings. *People v. Jones*, 213 Ill. 2d 498, 505 (2004). Notwithstanding, the defendant must clearly set forth all potential claims in his petition, and "[a]ny claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived." 725 ILCS 5/122-3 (West 2018). The appellate court cannot consider claims that the defendant did not include in his postconviction petition, nor may counsel argue such claims on appeal. See *People v. Cole*, 2012 IL App (1st) 102499, ¶¶ 15-16; see also *Jones*, 213 Ill. 2d at 508 ("[O]ur appellate court is not free, as this court is under its supervisory authority, to excuse, in the context of postconviction proceedings, an appellate waiver caused by the failure of a defendant to include issues in his or her postconviction petition.").

¶ 36 After reviewing the contents of the defendant's petition and supporting affidavits, we conclude that he did set forth a claim of actual innocence based on newly discovered evidence. In his postconviction petition, the defendant alleged that Cain was willing to testify that he was not the shooter, which is supported by Cain's own affidavit in which he averred that the defendant could not have been the shooter because he was on the basketball court with him at the time. The defendant also alleged that the outcome of his trial would have been different if the jury had been able to hear Cain's testimony. Given that we must liberally construe the defendant's petition at the first stage of proceedings, we conclude that the defendant set forth a claim of actual innocence.

¶ 37 Having determined that the defendant's petition included a claim of actual innocence, we must now address whether the defendant set forth an arguable claim based on Cain's affidavit.

¶ 38 To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would

probably change the result on retrial. *People v. Edwards*, 2012 IL 111711, ¶ 32. Newly discovered evidence is evidence that was discovered after trial and that the defendant could not have discovered earlier through the exercise of due diligence. *People v. Coleman*, 2013 IL 113307, ¶ 96. Evidence is material if it is relevant and probative of the defendant's innocence. *Id.* Noncumulative evidence adds to the information that the fact finder heard at trial. *Id.* (citing *People v. Molstad*, 101 Ill. 2d 128, 135 (1984)). Lastly, the conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result. *Id.* ¶ 96 (citing *People v. Ortiz*, 235 Ill. 2d 319, 336-37 (2009)). The conclusive character of the new evidence is the most important element of an actual innocence claim. *People v. Washington,* 171 Ill. 2d 475, 489 (1996).

¶ 39    Here, the defendant's actual innocence claim rests on Cain's affidavit, which he contends is newly discovered evidence that he was not one of the shooters but was, instead, one of the many victims who fled for safety. Cain, who was the only person shot on the day in question, averred in his affidavit that the defendant could not have been the shooter because he was on the basketball court with him when the shooting began.

¶ 40    As set forth above, evidence is newly discovered where it was discovered after trial and where the defendant could not have discovered it earlier through the exercise of due diligence. *Coleman*, IL 113307, ¶ 96. It goes without saying that the defendant cannot claim he was unaware of Cain's existence prior to trial, as Cain was a victim in this case. That said, the defendant's trial counsel testified at the *Krankel* hearing that she spoke with Cain prior to trial, and he indicated he did not want to participate for either the State or the defense. She also denied that Cain told her the defendant was not one of the perpetrators. Based on these representations, we concluded on direct

appeal that the defendant's trial counsel was not ineffective for not calling Cain as a witness. If Cain expressed an unwillingness to cooperate prior to trial, as the defendant's trial counsel testified, it would have been reckless for trial counsel to call him as a witness. Consequently, we cannot say that the defendant failed to exercise diligence in obtaining Cain's testimony, and therefore, we find that the Cain's evidence is newly discovered.

¶ 41    Turning to the next elements, there can be little dispute that Cain's evidence is material and noncumulative, as it is relevant and probative of the defendant's innocence and no other witness testified at trial that the defendant was on the basketball court when the shooting began. Thus, the remaining question is whether Cain's evidence is of such a conclusive character as would probably change the outcome on retrial.

¶ 42    As previously noted, the new evidence supporting an actual innocence claim need not be entirely dispositive to be likely to alter the result on retrial. *Coleman*, 2013 IL 113307, ¶ 97. Rather, the conclusive-character element requires only that the defendant present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. *Id.* Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence. *Id.* In conducting this inquiry, we are mindful that "all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true and that we are precluded from making factual and credibility determinations." *People v. Thomas*, 2020 IL 123849, ¶ 45.

¶ 43    The State contends that Cain's evidence is not of such a conclusive character that it would probably change the outcome on retrial because his affidavit lacks detail and is conclusory.

Specifically, the State faults Cain for failing to "attest that he observed [the defendant] at the moment the shooting occurred" and for failing to provide "detail as to where or from whom the shots came." We disagree. To begin, we find the State's claim that Cain failed to attest to the defendant's whereabouts when the shooting began perplexing. Cain stated in his affidavit that he knew the defendant was not one of the perpetrators because "he was with me playing basketball when the shooting was going on." Cain makes it clear where the defendant was when the shooting began: on the court with him playing basketball. Moreover, it is not surprising that Cain would not be able to provide detail as to "where or from whom the shots came" if he was, as he claims, playing basketball at the time of the shooting. His focus, naturally, would have been elsewhere. While we acknowledge that Cain's affidavit is not the most detailed account, he does provide sufficient information to convey the crucial point: the defendant was not the person who shot him.

¶ 44    The State also contends that Cain's affidavit is contradicted by the trial testimony of Davis and Standors, who both testified that the defendant was not on the court playing basketball, but rather, he stopped by the court briefly to speak with Cain before leaving. However, as our supreme court recently held, "the existence of a conflict with the trial evidence is not the same as finding that the new evidence is positively rebutted." *Robinson*, 2020 IL 123849, ¶ 60. In order for Cain's claim to be positively rebutted, the record must affirmatively demonstrate that a "trier of fact could never accept" the veracity of his claims. *Id.* That is not the case here, as a trier of fact could very well credit Cain's recollection over that of Davis and Standors, particularly where both men also placed the defendant at the scene.

¶ 45    Lastly, the State argues that, even taking Cain's affidavit as true, his testimony would not have changed the outcome of the defendant's trial because the evidence of his guilt was

overwhelming. Again, this is not the appropriate lens with which to view the issue at the first stage of proceedings. Our task at this stage is not to weigh the evidence or make credibility determinations. Rather, as mentioned, we take all allegations alleged in the defendant's postconviction petition and supporting affidavits as true unless positively rebutted by the record. We then ascertain whether the defendant made an arguable showing that it is probable that the outcome of his trial would have been different. See *Robinson*, 2020 IL 123849, ¶ 48. We find that he has made such a showing. Nothing in Cain's affidavit is positively rebutted by the record, it merely contradicts certain trial testimony. We therefore must accept the contents of Cain's affidavit as true, and given the substance of Cain's affidavit, we find that it places the trial evidence in a new light and undermines confidence of the finding of guilt. See *Id.* ¶ 48.

¶ 46     Accordingly, we find the defendant satisfied the low threshold applicable to first-stage proceedings and set forth an arguable claim of actual innocence by presenting a potential witness, who also happens to be the only victim injured in this case, who averred that the defendant was not one of the perpetrators. See *Robinson*, 2020 IL 123849 ¶ 73 (finding in the context of a motion for leave to file a successive postconviction petition alleging actual innocence that a newly discovered eyewitness affidavit that contradicted, but was not positively rebutted by, the State's eyewitnesses regarding the identification of the offender was "a reason to allow [the] petitioner to proceed, with counsel, on his colorable claim of actual innocence").

¶ 47     We need not address defendant's additional claims because partial dismissals are not permitted at the summary dismissal stage. See *People v. Rivera*, 198 Ill. 2d 364, 374 (2001). Thus, his entire petition is remanded to the circuit court to be docketed for second-stage proceedings. See *People v. Plummer*, 344 Ill. App. 3d 1016, 1024-25 (2003).

¶ 48    For the foregoing reasons, we reverse the judgment of the circuit court of Cook County and remand for further proceedings.

¶ 49    Reversed and remanded.